Van Brunt, P. J., Ingraham, McLaughlin and Hatch, JJ., concurred.

Judgment reversed, new trial ordered, costs to appellant to abide event.

---

Mary E. Coolidge, as Administratrix, etc., of Erwin L. Coolidge, Deceased, Respondent, *v.* The City of New York and Others, Appellants, Impleaded with Charles A. Cowen.

*Negligence — injury from the fall of a temporary bridge constructed over an excavation in a city sidewalk — when the city is not liable — when the question as to the negligence of a sub-contractor building the bridge is one of fact for the jury — freedom from contributory negligence — competency as evidence of a model of the bridge — a $22,000 verdict held to be excessive.*

In an action brought to recover damages resulting from the death of the plaintiff's intestate it appeared that the defendant Corn, who was the owner of a lot in the city of New York, a party defendant in the action, made a contract with the defendant Cowen to erect a building upon said property; that the plans for the building involved the construction of a vault under the sidewalk which necessitated the construction over the sidewalk while the vault was being built of a temporary bridge; that the municipal authorities granted a permit for the construction of the vault and bridge and that Cowen made a contract with the defendants Miller and Holme to provide the materials and construct such temporary bridge; that the temporary bridge was constructed under the direction of the defendant Miller, who was an expert bridge builder of many years' experience; that the bridge had been completed and was in use for two or three weeks before May 27, 1902, on which day a parade was to pass the temporary bridge; that in the early morning of that day a police

officer notified his sergeant that the bridge was not safe for a large crowd; that the police officer, by direction of the sergeant, notified the foreman of the defendant Cowen that the bridge was unsafe; that this foreman and another person examined the bridge and pronounced it safe; that the police officer also examined it and deemed it safe; that in the afternoon the defendants barricaded the bridge so as to prevent persons desirous of seeing the parade from going thereon; that the barriers were torn down and the crowd went upon the bridge; that police officers were then stationed upon it for the purpose of keeping the crowd from gathering thereon; that while the parade was passing and after the number of persons passing over the bridge had been augmented by people coming from department stores in the vicinity, the bridge collapsed and the intestate, who, as the evidence tended to show, was then upon the bridge, was crushed to death.

The collapse of the bridge, as the evidence tended to show, was due to the fact that it was not sufficiently braced to sustain the lateral strain arising from its use by a large crowd. It did not appear, however, that the bridge was not reasonably safe for the ordinary street use to which it was subjected.

Upon the trial, the court, with the plaintiff's consent, dismissed the complaint as to the defendant Cowen, but as to the other defendants he submitted the case to the jury which rendered a verdict in favor of the plaintiff for $22,000.

*Held,* that as to the city of New York, the verdict that it was guilty of negligence was against the weight of evidence;

That the question whether the defendants Miller and Holme, who had constructed the temporary bridge, were guilty of negligence was properly submitted to the jury;

That the jury were justified in finding that the plaintiff's intestate was free from contributory negligence;

That the plaintiff having introduced in evidence a model of the bridge, which the testimony produced on her behalf tended to show was a correct representation of the bridge, the fact that the defendants gave evidence tending to show that the bridge had four uprights, while the model showed only three, did not render it improper for the court to refuse to strike out the model as evidence.

It appeared that the deceased was thirty-seven years of age and that he left a wife and four children; that all of the children were under five years of age at the time of his death, and that one of them had died since the trial. There was no definite evidence as to the amount of the deceased's earnings or whether he had been able to save anything. His wife testified that she had received from twenty to twenty-five dollars a week from the deceased for the support of herself and her children.

*Held,* that a verdict for $22,000 should be reduced to $15,000.

LAUGHLIN, J., dissented from the reversal of the judgment against the city of New York, and VAN BRUNT, P. J., dissented from the affirmance, as reduced, of the judgments against Miller and Holme.

APPEAL by the defendants, The City of New York and others, from a judgment of the Supreme Court in favor of the plaintiff,

entered in the office of the clerk of the county of New York on the 29th day of January, 1904, upon the verdict of a jury for $22,000, and also from two orders entered in said clerk's office on the 28th day of January, 1904, and 29th day of January, 1904, respectively, denying said defendants' motions for a new trial made upon the minutes.

*Terence Farley,* for the appellant The City of New York.

*A. A. Spear,* for the appellants Miller and Holme.

*William B. Waring,* for the respondent.

Ingraham, J. :

It appears that one Henry Corn was the owner of certain property upon the northwest corner of Eighteenth street and Fifth avenue, in the city of New York; that he made a contract with the defendant Cowen to erect a building upon said property; that Cowen made a sub-contract with the defendants Miller and Holme to provide the materials and perform the labor for the necessary shoring, sheath piling and construction of a temporary bridge or sidewalk for use during the construction of the building; that Corn, the owner of the property, applied to the commissioner of public works of the city of New York for a license to construct a vault extending into Fifth avenue, and obtained such permit or license upon payment to the city of the sum of $5,886, and that this license contained a permit which authorized Corn to erect a bridge, not to exceed five feet in height above the sidewalk, and extending no greater distance than the length of the excavation for the vault authorized by the permit. There is no question but that this permit was valid and authorized by the charter and ordinances of the city of New York.

Corn made the contract with the defendant Cowen for the erection of the building, which included the erection of the necessary bridge over the sidewalk during the construction of the vault. Cowen made a sub-contract with the defendants Miller and Holme, by which Miller and Holme undertook to provide all the materials and perform all the work mentioned in the specifications annexed to

First Department, December, 1904. [Vol. 99.

the contract and shown by the drawings prepared by the architect for the shoring of the adjoining buildings, sheath piling of outside line of property, including vaults, bridges over sidewalk vaults and material, platform over sidewalks for buildings to be erected upon the premises; the work to be done under the direction of the architect, and for which Miller and Holme were to receive $4,400. In pursuance of this contract the defendants Miller and Holme erected a bridge over the excavation under the sidewalk and the portion of the street necessary to construct the vault authorized by the permit from the city, and the bridge was in use for two or three weeks after it was completed before the 27th day of May, 1902.

On that day there was a parade up Fifth avenue. A large number of people were upon this bridge while the parade was passing, when a portion of the bridge suddenly collapsed, throwing a number of the people that were on it into the excavation. A police officer who was on duty on this bridge testified that he went down when the bridge gave way into the excavation; that he fell towards Sixth avenue, landing about twelve or fourteen feet west of where he was standing before the bridge fell; that he fell upon a large beam and that he noticed under it the body of a man; that he with others took up the beam and took up the body of this man, whose head had been crushed by the beam; that the man was then dead; that just before the accident the witness, who was standing on the bridge, felt the bridge shake; that the officers had been warned to keep the people moving or the bridge might fall into the cellar, and they were doing the best they could to keep the bridge from being crowded; that just before this accident there was a large number of people who had come from department stores on Sixth avenue; that these people added to those in the street caused many more people on the bridge than before, and it was when the increased number of people came that the officer first noticed that the bridge was shaking.

This bridge was constructed of timber under the immediate direction of the defendant Miller, who had been engaged in the construction of bridges of this kind for about thirty years. There was evidence tending to show that when a good many people were passing over the bridge there was a lateral swaying; that there were no side supports to the three upright beams upon which the crosspieces

which sustained the bridge rested, no knee braces or angle braces to support the timbers used in the construction of the bridge, simply a crosspiece resting upon an upright. There was also evidence to show that early in the morning of the twenty-seventh of May, the day of the accident, a police officer who was on duty at this point reported to his sergeant of police that this bridge was in an unsafe condition should a crowd collect to witness the parade on the twenty-seventh. This report was received by the sergeant of police after midnight. There was evidence of an expert who, in answer to a hypothetical question, testified that the cause of the falling of the bridge was the lack of lateral or transverse bracing; that there was nothing to protect this bridge while swaying under the weight of a moving crowd from starting in this direction.

At the close of the plaintiff's testimony the complaint as to the defendant Cowen was dismissed by consent of the plaintiff, whereupon the defendants The City of New York and Miller and Holme severally moved to dismiss the complaint. The motions were denied and the defendants excepted. On the part of the defendants there was evidence as to the construction of the bridge and the braces to prevent lateral motion. The defendant Miller, under whose direction the bridge was constructed, was an expert bridge builder, having been engaged in work of this kind for upwards of thirty years. Competent foremen were employed, who had also been engaged in work of this kind for many years. There was also evidence that on the morning of the accident a builder was requested to inspect the bridge. He made an examination and testified that he found the bridge in fair condition for that purpose; that he was present when the bridge collapsed; that immediately before the collapse of the bridge he saw it begin to sway and immediately after came the crash. This witness testified that he had been in the building business twenty-five years, and the braces he had described which were employed in strengthening this bridge were sufficient to make a strong substantial structure. It was also proved that before the crowd gathered on Fifth avenue to see the parade, some of the defendants erected barricades across the approaches to this bridge to prevent its being used, but that subsequently they were torn away and the bridge was crowded with people constantly moving under the direction of the police.

First Department, December, 1904.          [Vol. 99.

A police sergeant, when the report of the officer on the post was brought to his attention, instructed the officer to notify the person in charge of this bridge that a report had been made that this bridge was unsafe, and subsequently the officer reported to the sergeant that he had notified the foreman of the defendant Cowen that the bridge was unsafe; that this foreman and another person had made an examination of the bridge and found that it was sound. The officer who was instructed to inform the person in charge of the bridge as to its condition testified that he saw the defendant Cowen's foreman and informed him that the bridge was unsafe; that the officer examined the bridge, and it seemed to be strong and safe. Police officers in charge of this locality testified to the difficulty they had in keeping this bridge from being crowded with persons desiring to see the parade; that the crowd had greatly increased just before the collapse, and the people were then forcing their way up on the steps on the Eighteenth street end of the bridge; that prior to the collapse none of the officers saw any indication of danger, and several of them were on the bridge when it fell and went down with it. A building inspector attached to the department of buildings also testified that he inspected this bridge during and subsequent to its construction; that he found the bridge constructed of good seasoned lumber, with proper side railing, braces and steps.

Upon this record there are two questions presented, which are based upon substantially different legal propositions. The first is whether there is evidence to justify a finding that the city is liable, and the second as to whether the contractors who built the bridge are liable. I do not think that it can be fairly said that there is any evidence to sustain a finding that this bridge was unsafe for the ordinary street use of Fifth avenue in this locality. The evidence is undisputed that it was used for upwards of two weeks prior to the accident, and subsequently was reconstructed in the same way as originally constructed, and continued in use until the building was completed. The conditions that existed on the day of the accident were most unusual. In consequence of a parade large crowds had assembled on the avenue along the line of parade, which crowds were largely augmented by the closing of the department stores in the vicinity just prior to the collapse. They gathered upon this bridge, and it was undoubtedly because of the extraordi-

nary strain placed upon the bridge because of this crowd of people that it collapsed. Could the officers of the city, responsible for the condition of this street, be chargeable with notice that such a condition would exist? To hold the city of New York liable there must be a finding fairly sustained by the evidence that in consequence of their negligence this street was not in a reasonably safe condition for use at the time of the accident. There certainly is no evidence to sustain a finding that the street was not reasonably safe for an ordinary street use. It is apparent that the police on the night of the twenty-sixth and the morning of the twenty-seventh of May had notice of the fact of this parade, and in the early morning of the twenty-seventh the officer on this beat reported to his superior officer that this bridge would be unsafe if a large crowd of people were allowed to gather on it. Thus, a question as to its condition was brought to the attention of the city authorities on the morning of the twenty-seventh, and the question then comes as to whether these public officers exercised the care of a prudent person under the existing conditions.

What were the police to do when this question was presented? They had no facilities for strengthening the bridge, and the evidence is undisputed that they at once took measures to warn the persons in charge of the bridge of the condition. Such warning was given, and the public officials had a right to infer that reasonable means would be taken by those responsible for the bridge to prevent an accident. The police officers recognized the danger from overcrowding the bridge. They took such means as appeared to them proper to avert that danger. Police officers were placed in charge of the bridge to prevent people from gathering and standing on it, and they did all that they could do except to strengthen the bridge, for which they had no facilities and which it would be most unjust to require them to do on such short notice. The city is responsible for a failure to take such means as were available at the time to keep this street in a safe condition; but there is nothing to show that such an unusual crowd could have been anticipated or that the city could have done any more than it did to prevent the accident. The expert testimony offered by the defendants is at least sufficient to show that competent bridge builders considered this bridge, constructed as it was, a safe and

proper bridge for the use to which it was put. The police officers, who were upon the bridge regulating the traffic, and who went down with the bridge, had certainly no reason to suppose that if the crowd was kept moving there was any danger. They adopted what appeared to them to be proper precautions to protect those using the bridge, and expert and competent bridge builders have testified that the bridge was a safe and proper structure for any ordinary use for which it could be expected to be put. Could the city authorities be expected to know more than these expert and competent bridge builders? It is not fair to charge those responsible for the maintenance of this street with a knowledge that has been acquired by the accident itself; and unless there is evidence to justify a finding that from the conditions that existed at the time the city was negligent, this verdict cannot be sustained. Taking the evidence as a whole I am satisfied that the verdict of negligence as against the city of New York was against the weight of evidence and that it should be set aside.

The next question presented is as to the liability of Miller and Holme, but it is quite evident that their obligation to those lawfully using the street was quite distinct from that of the city of New York. They had undertaken to construct a temporary bridge over an excavation in a part of the public street. In the construction of such a temporary bridge it was their duty to so construct it that those lawfully using the street should be reasonably free from danger. "It is not to be expected, and cannot be required, that the temporary covering shall equal in safety and convenience the sidewalk removed, or that passengers may cross with as little heed and care as upon the completed pavement. * * * But if the builder opens his covering to the passage of the public, although only as a temporary substitute, he must be deemed to declare it safe and free from peril to persons crossing with such ordinary prudence and care as the presence of the temporary structure requires, and so he must build it with so much of care and skill and prudence as will reasonably protect the passers from peril, and enable them with some ordinary attention to their steps to pass it with safety." (*Nolan* v. *King*, 97 N. Y. 565.) Applying this rule, I think, upon the evidence in this case, the question of the negligence of the defendants Miller and Holme was for the jury. They constructed this bridge in a public .

street.   The bridge fell while persons were lawfully upon it, causing them injury; and while it is true that at the time of the fall the bridge was crowded with persons who had come to view the parade on Fifth avenue, at the same time there is evidence from which the jury could ·find that the braces to make such a structure safe were omitted, and that it was the absence of those braces that caused the structure to fall.   At the time of the accident persons were not allowed to stand upon the bridge, but were compelled by the police to keep moving.   Thus the bridge was being used solely as a part of the sidewalk by pedestrians in the street; and in constructing the bridge it was the duty of the defendants Miller and Holme to so construct it that it would be reasonably safe for those using it, whether crowded or not.   I think, therefore, that there was no error in the court's refusing to dismiss the complaint as to the defendants Miller and Holme.

It is also claimed by the defendants that there was no evidence to show that the plaintiff's intestate was a traveler upon the street, or that he was on the bridge at the time it collapsed.   I think that there was evidence from which the jury could infer that the plaintiff's intestate was upon this bridge and was carried down by it.   A policeman who was on the bridge at the time, and who was carried down with it and injured, testified that he was on the bridge from half-past one until the time it fell; that he looked down in the excavation underneath the bridge several times and did not at any time see any one beneath the bridge, to the west of the bridge, or at any place in the excavation; that he looked several times, but saw no one in the excavation.   Officer Howard, a detective sergeant, testified that at the time the bridge fell there were 250 or 300 people on it; that about 50 went down into the excavation; that at the time of the collapse he was right back of the plaintiff's intestate and the witness fell into the excavation; that he helped another officer carry the plaintiff's intestate on a stretcher to an office building in Eighteenth street; that the plaintiff's intestate was found in the excavation under one of the large timbers with which the bridge was constructed.   Upon this evidence the jury were justified in finding that the plaintiff's intestate was upon the bridge and fell with it when it collapsed.   The jury were certainly justified in finding that the deceased was free from contributory negligence if

at the time of the accident he was upon the bridge and went down with it. There could be no contributory negligence in the use of this bridge under the circumstances, as any one walking along the sidewalk and required to use the bridge in consequence of the parade in the street would be justified in assuming that the defendants had performed their duty and built the bridge so that it was reasonably safe for use.

There are several exceptions to rulings upon questions of evidence which are relied on by the appellants. The plaintiff produced what purported to be a model of this bridge, and called a witness who testified that he had constructed the model and as to its construction. This model represented three uprights, upon which rested three needles supporting the stringers, upon which was the platform of the bridge. Another witness was called, and testified that this model was a correct representation, to the best of his recollection, of the general construction work of the bridge at the time he saw it, which was before the collapse. Subsequently there was evidence tending to show that there were four uprights upon which rested needles instead of three as shown by the model, and the evidence introduced by the plaintiff tended to show that the cause of the collapse was a lack of bracing, as it was conceded that the timber was proper for the purposes for which it was used, and none of the timber was broken. There was other evidence as to the construction of the bridge which it appears established that the model was a substantial reproduction of the bridge, with the exception of the number of uprights, and under those circumstances I do not think it was error for the court to admit the model in evidence or to refuse to strike it out upon the motion of the defendants. There was evidence, at any rate, tending to show that this model was a correct representation of the bridge before the collapse, and so far as that evidence was contradicted by the defendants, the question was for the jury.

The defendants also claim that the verdict was excessive. It was for $22,000. The deceased was thirty-seven years of age, had a wife (the plaintiff) and four children, the oldest about four and a half years of age and the youngest three and a half months at the time of his death. One of these children has died since the trial. There is no definite evidence as to the amount the deceased earned.

The plaintiff testified that she received from the deceased from twenty to twenty-five dollars a week for herself and her children.

I am inclined to think that this verdict is excessive. There is no evidence that the deceased had been able to save anything. His contribution for the support of his family was from twenty to twenty-five dollars a week. Twenty-five dollars per week would make one thousand three hundred dollars a year. The jury could only award for the pecuniary injury sustained by the widow and next of kin in consequence of the death of the decedent. (Code Civ. Proc. § 1904.) The income from this award would produce almost as much as the deceased contributed to the support of his family; and assuming that the deceased would have lived thirty years, the amount awarded is much in excess of that which would be required to produce such an income as the deceased had contributed to the support of his family during that period. Under the circumstances I am inclined to think that we would not be justified in sustaining a verdict for more than $15,000.

Our conclusion is that the judgment and order appealed from as against the city of New York must be reversed and a new trial ordered, with costs to the appellant to abide the event; and that the judgment against the defendants Miller and Holme, and the order denying new trial as to them, be reversed and a new trial ordered, with costs to the appellants to abide the event, unless the plaintiff stipulates to reduce the judgment as entered, including interest, costs and allowance, to the sum of $17,167.11; and upon so stipulating, the judgment and order are affirmed, without costs.

PATTERSON and HATCH, JJ., concurred; VAN BRUNT, P. J., dissented on the ground that the judgments should be reversed; LAUGHLIN, J., dissented in part.

LAUGHLIN, J.:

I concur in the modification of the judgment, but dissent from the reversal of judgment as to the city.

Judgment and order as against the city of New York reversed, new trial ordered, costs to appellant to abide event; and judgment

and order as against defendants Miller* reversed and new trial ordered, with costs to appellants to abide event, unless plaintiff stipulates to reduce judgment as entered, including interest, costs and allowance, to the sum of $17,167.11, in which event judgment, as so reduced, and order affirmed, without costs.